# United States Court of Appeals for the Federal Circuit

2007-1226, -1227, -1254

TOKYO KIKAI SEISAKUSHO, LTD. and TKS (U.S.A.), INC.,

Plaintiffs-Cross Appellants,

and

MITSUBISHI HEAVY INDUSTRIES, LTD.,

Plaintiff,

v.

UNITED STATES,

Defendant-Appellant,

and

GOSS INTERNATIONAL CORPORATION,

Defendant-Appellant.

Lawrence R. Walders, Sidley Austin LLP, of Washington, DC, argued for plaintiffs-cross appellants. With him on the brief were Neil R. Ellis, and Jennifer Haworth McCandless. Of counsel on the brief were Peter J. Toren, Kasowitz Benson Torres & Friedman, of New York, New York; and Hoken S. Seki, Law Offices of Hoken S. Seki, of Lake Forest, Illinois. Of counsel was Neil Charles Pratt, Sidley Austin LLP, of Washington, DC.

Maame A.F. Ewusi-Mensah, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant, United States. With her on the brief were Michael F. Hertz, Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel was Kent G. Huntington, Attorney. Of counsel on the brief were Michele D. Lynch, Senior Counsel, and Hardeep K. Josan, Attorney International, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

John R. Shane, Wiley Rein LLP, of Washington, DC, argued for defendant-appellant, Goss International Corporation. With him on the brief were Charles O. Verrill, Jr. and Eileen P. Bradner.

Appealed from: United States Court of International Trade

Judge Judith M. Barzilay

# United States Court of Appeals for the Federal Circuit

2007-1226, -1227, -1254

TOKYO KIKAI SEISAKUSHO, LTD. and TKS (U.S.A.), INC.,

Plaintiffs-Cross Appellants,

and

MITSUBISHI HEAVY INDUSTRIES, LTD.,

Plaintiff,

v.

UNITED STATES,

Defendant-Appellant,

and

GOSS INTERNATIONAL CORPORATION,

Defendant-Appellant.

Appeal from the United States Court of International Trade in case no. 06-00078, Judge Judith M. Barzilay.

———————————————

DECIDED: June 17, 2008

———————————————

Before LOURIE, LINN, and PROST, <u>Circuit Judges</u>.

LINN, <u>Circuit Judge</u>.

In this antidumping case, we are asked to determine the scope of the Department of Commerce's ("Commerce's") authority to reopen proceedings tainted by fraud. Following Commerce's receipt of information indicating that Tokyo Kikai Seisakusho, Ltd. and TKS (U.S.A.), Inc. (collectively, "TKS") had provided false information during yearly administrative reviews of an existing antidumping duty order to

which they were subject, Commerce initiated a "changed circumstances review." It initiated that proceeding to reconsider the administrative reviews themselves, as well as its revocation of the antidumping duty order, which was based in part on the results of those administrative reviews. In the final results of the changed circumstances review, Commerce concluded that TKS had provided false information during one of the administrative reviews and modified the result of that review accordingly. Because the result of that review originally led Commerce to revoke-in-part the antidumping duty order as it applied to TKS, Commerce reinstated that portion of the antidumping duty order. Finally, Commerce also stated its intention to reopen in a future, separate proceeding the sunset review that had revoked the antidumping duty order in its entirety.

The Court of International Trade ("the trial court") concluded that Commerce possessed authority to conduct the changed circumstances review, <u>Tokyo Kikai Seisakusho, Ltd. v. United States</u>, 473 F. Supp. 2d 1349, 1355 (Ct. Int'l Trade 2007) ("<u>TKS</u>"), but concluded, after determining that the issue was ripe, that Commerce lacked authority to reopen the sunset review for reconsideration, <u>id.</u> at 1361-62. The United States and Goss International Corporation (collectively, "Appellants") appeal the trial court's decision, arguing that the issue of whether Commerce has authority to reopen the sunset review is not ripe, and alternatively, that Commerce possesses such authority. TKS cross-appeals the trial court's decision, arguing that Commerce lacks authority to conduct a changed circumstances review in the circumstances of this case for the purpose of reconsidering the yearly administrative reviews or the revocation of the antidumping duty order.

We conclude that the trial court correctly determined that Commerce possesses inherent authority to reconsider the results of the yearly administrative reviews in light of TKS's fraud, but that it incorrectly determined that Commerce's stated intention to reopen the sunset review made it ripe for judicial review. Thus, we affirm-in-part and reverse-in-part.

## I. BACKGROUND

This case involves the importation of large newspaper printing presses and their components, which the parties and the trial court refer to as "LNPPs." Goss International Corporation ("Goss"), a domestic producer of LNPPs, alleged that TKS and Mitsubishi Heavy Industries, Ltd. ("MHI") were engaged in dumping that was causing material injury to the domestic industry.[1] In 1996, Commerce determined that TKS and MHI were selling LNPPs imported from Japan at less than fair value. Notice of Final Determination of Sales at Less Than Fair Value: Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan, 61 Fed. Reg. 38,139, 38,139 (Dep't of Commerce July 23, 1996); see also Notice of Antidumping Duty Order and Amended Final Determination of Sales at Less Than Fair Value: Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan, 61 Fed. Reg. 46,621 (Dep't of Commerce Sept. 4, 1996). Following a finding by the International Trade Commission that this dumping was

---

[1] We presume familiarity with the general scheme of the antidumping laws. For further reference, see, for example, Ad Hoc Shrimp Trade Action Committee v. United States, 515 F.3d 1372 (Fed. Cir. 2008), and FAG Italia S.p.A. v. United States, 291 F.3d 806 (Fed. Cir. 2002).

causing material injury to the domestic industry, Commerce issued a final antidumping duty order covering these LNPPs. 61 Fed. Reg. at 46,622.

During three successive one-year periods—1997-1998, 1998-1999, and 1999-2000—Commerce conducted yearly administrative reviews to determine whether TKS was continuing to dump LNPPs, and concluded that it was not. Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan: Final Results of Antidumping Duty Administrative Review and Revocation in Part, 67 Fed. Reg. 2,190, 2,191-92 (Dep't of Commerce Jan. 16, 2002). Section 351.222(b) of 19 C.F.R. provides for revocation of an antidumping duty order based on certain showings, including evidence of sales at not less than normal value for three consecutive years. In January 2002, pursuant to section 351.222(b) and based on the results of the three consecutive administrative reviews showing a zero dumping margin, Commerce revoked the antidumping duty order with respect to TKS. Id.

In August 2001, during the course of the yearly administrative reviews, Commerce initiated a "sunset review" of the antidumping duty order as applied to all parties. Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan (A-588-837) and Germany (A-428-821): Notice of Final Results of Five-Year Sunset Reviews and Revocation of Antidumping Duty Orders, 67 Fed. Reg. 8,522, 8,522 (Dep't of Commerce Feb. 19, 2002). Goss initially filed a notice of intent to participate as a domestic party, but later withdrew from participation. Id. Goss was the sole domestic interested party. Because Goss, as the sole domestic interested party, withdrew its interest in participating, Commerce "determined to treat th[e] situation as if no domestic interested party responded to the

notice of initiation of th[e] sunset reviews." Id. at 8,523. Consequently, Commerce, effective September 4, 2001, revoked the antidumping duty order in its entirety, citing statutory and regulatory provisions requiring revocation of the order if no domestic interested party participates. Id. (citing § 751(c)(3)(A) of the Tariff Act of 1930 and 19 C.F.R. § 351.218(d)(1)(iii)(B)(3)).

While the foregoing matters were before Commerce, Goss, in May 2000, brought a civil action against TKS under the Antidumping Act of 1916, 15 U.S.C. § 72, alleging that TKS had unlawfully dumped LNPPs from Japan.[2] See Goss Int'l Corp. v. Tokyo Kikai Seisakusho, Ltd., 321 F. Supp. 2d 1039, 1042 (N.D. Iowa 2004). In December 2003, the jury returned a verdict in Goss's favor, and the district court subsequently found, in the context of TKS's motions for new trial and for judgment as a matter of law, that the evidence at trial supported the jury's verdict that TKS had "dumped" LNPPs in the United States. See generally id. In upholding the jury's verdict, the district court pointed specifically to evidence presented at trial that TKS had provided a "secret rebate" to the Dallas Morning News newspaper to prevent Goss from making that sale, and that "TKS and its counsel engaged in a concerted effort to conceal the secret rebates." Id. at 1045. The sale in question was the sole transaction considered during Commerce's 1997-1998 administrative review of TKS. Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan: Initiation of Changed Circumstances Review, 70 Fed. Reg. 24,514, 24,515-16 (Dep't of Commerce May 10, 2005).

---

[2] Congress repealed the statute in 2004.

Although it is unclear from the record how, the decision, including the jury's verdict and the findings of the district court relating to the evidence, came to the attention of Commerce, and in May 2005, Commerce self-initiated a changed circumstances review for the purpose of reconsidering the results of the three yearly administrative reviews in which it found that TKS had a zero dumping margin. Id. In September 2005, after giving interested parties an opportunity to submit factual information, Commerce published its preliminary results of the changed circumstances review. Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan: Preliminary Results of Changed Circumstances Review, 70 Fed. Reg. 54,019 (Dep't of Commerce Sept. 13, 2005). In the Preliminary Results, Commerce concluded that "TKS provided false information in the context of the 1997-1998 administrative review." Id. at 54,021. This preliminary conclusion was based on two findings: (1) TKS granted a secret rebate in connection with the sale to the Dallas Morning News; and (2) TKS, when specifically asked whether it had granted a rebate in connection with that sale, unequivocally stated that it had not. Id. In March 2006, Commerce published the final results of the changed circumstances review, affirming its preliminary determinations. Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan: Final Results of Changed Circumstances Review, 71 Fed. Reg. 11,590, 11,591 (Dep't of Commerce Mar. 8, 2006). Based on the final results, Commerce: (1) applied an adverse facts available rate of 59.67 percent to TKS for the 1997-1998 administrative review period; (2) did not apply an adverse facts available rate for the 1998-1999 and 1999-2000 administrative review periods; and (3) reinstated the antidumping duty order as it

applied to TKS from September 1, 2000, the effective date of the revocation as to TKS, though September 3, 2001, the day before the effective date of the sunset revocation. Id. Commerce also provided advance notification of its intent to reopen the 2002 sunset review in a separate proceeding. Id. at 11,591-92.

TKS and Goss challenged the final results in the Court of International Trade.[3] Specifically, TKS challenged: (1) Commerce's authority to initiate and conduct the changed circumstances review; (2) Commerce's determination to reinstate the antidumping duty order as to TKS for the period from September 1, 2000 through September 3, 2001; and (3) Commerce's determination to reopen for reconsideration the sunset review that resulted in the complete revocation of the antidumping duty order. TKS, 473 F. Supp. 2d at 1351. Goss challenged Commerce's determination not to apply an adverse facts available rate to TKS for the 1998-1999 and 1999-2000 administrative reviews. Id.

As relevant to this appeal, the trial court sustained Commerce's authority to conduct the changed circumstances review. Id. at 1355 ("Under such circumstances, Commerce has the inherent authority to self-initiate a review of its prior determinations to purge them of fraudulent data."); id. ("Given the severe fraud perpetrated by TKS during the 1997-1998 administrative review, . . . Commerce acted lawfully when it initiated and conducted reviews of those determinations."). The trial court also affirmed Commerce's determinations to apply an adverse facts available rate to TKS for the 1997-1998 administrative review, cf. id. at 1355-56, to not apply one for the 1998-1999

---

[3] MHI also challenged certain aspects of the final results. Because MHI is not a party to this appeal, however, we omit any discussion of its challenge.

and 1999-2000 reviews, id. at 1364, and to reinstate the antidumping duty order as applied to TKS, id. at 1357. Finally, the trial court concluded that the issue of whether Commerce had authority to reopen the sunset review proceeding was ripe, id. at 1360, and that Commerce lacked authority to reopen the sunset review, id. at 1361-62.

Appellants timely appealed. They contend that whether Commerce has authority to reopen the sunset review is not ripe for judicial review. Alternatively, they argue that if the issue is ripe, Commerce possesses authority to reopen the sunset review in order to cleanse the proceedings of fraud. TKS counters that the issue is ripe, but contends that Commerce lacks authority to reopen the sunset review. TKS also cross-appeals the trial court's decision. It contends that Commerce lacks authority to conduct a changed circumstances review for the purpose of reconsidering the results of the administrative reviews or the revocation of the antidumping duty order. Appellants counter that Commerce possesses such authority in order to cleanse its proceedings of fraud.

We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## II. DISCUSSION

### A. Standard of Review

We review the Court of International Trade's decisions regarding Commerce's antidumping determinations de novo, applying the same standard of review to Commerce's determinations as did that court. Carpenter Tech. Corp. v. United States, 510 F.3d 1370, 1372 (Fed. Cir. 2007) (citations omitted). Thus, Commerce's antidumping determinations must be sustained unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." Id.

(quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).  The question of Commerce's inherent authority to reconsider its decisions is a question of law, over which we exercise <u>de novo</u> review.  <u>Cf.</u> <u>Macktal v. Chao</u>, 286 F.3d 822, 825 (5th Cir. 2002).

## B.  Analysis

### 1.  Commerce's Inherent Authority

The trial court found that "Commerce acted lawfully when it initiated and conducted reviews of [the yearly administrative reviews]."  <u>TKS</u>, 473 F. Supp. 2d at 1355.  It rationalized that, "[u]nder . . . circumstances [of fraud], Commerce has the inherent authority to self-initiate a review of its prior determinations to purge them of fraudulent data."[4]  <u>Id.</u>  TKS argues, on cross-appeal, that the trial court erred in determining that Commerce possessed authority to initiate and conduct the changed circumstances review.  It contends that "Commerce is limited to the exercise of powers that have been expressly delegated to it by Congress, and [] Commerce cannot exercise whatever inherent authority it may have in a manner that is contrary to the statute."  TKS Br. at 44 (internal citation omitted).  Appellants counter that the trial court correctly concluded that Commerce possesses inherent authority to cleanse its proceedings from the taint of fraud.

We begin with the recognition that administrative agencies are generally limited to the exercise of powers delegated them by Congress.  <u>Civil Aeronautics Bd. v. Delta Air Lines, Inc.</u>, 367 U.S. 316, 322 (1961) ("[T]he determinative question is not what the Board thinks it can do but what Congress has said it can do.");  <u>FAG Italia S.p.A. v.</u>

---

[4] Because the trial court concluded that Commerce's authority to reconsider was inherent, it did not reach the question whether Commerce possessed statutory authority to do so.  <u>TKS</u>, 473 F. Supp. 2d at 1356 n.7.

<u>United States</u>, 291 F.3d 806, 816 (Fed. Cir. 2002) ("[T]he Supreme Court has noted that 'an agency literally has no power to act . . . unless and until Congress confers power upon it.'" (quoting <u>La. Pub. Serv. Comm'n v. FCC</u>, 476 U.S. 355, 374 (1986))). Thus, as we concluded in <u>FAG Italia</u>, for example, Commerce may not conduct a duty absorption inquiry whenever it chooses, because the statute specifically provides for those inquiries only during the second or fourth year after the publication of an antidumping duty order. 291 F.3d at 814 (quoting 19 U.S.C. § 1675(a)(4)). The rationale for such a rule is straightforward: "The fact that Commerce is empowered to take action in certain limited situations does not mean that Commerce enjoys such power in other instances." <u>Id.</u> at 817.

TKS relies heavily on this principle, arguing primarily that because the statute authorizing reviews of changed circumstances sets forth only three situations in which such reviews are appropriate, none of which encompasses the situation here, Commerce acted contrary to the statute when it initiated a changed circumstances review of TKS's fraudulent conduct. Section 1675(b)(1) of 19 U.S.C. provides for "[r]eviews based on changed circumstances" in the following situations:

> (A) a final affirmative determination that resulted in an antidumping duty order under this subtitle or a finding under the Antidumping Act, 1921, or in a countervailing duty order under this subtitle or section 1303 of this title, (B) a suspension agreement accepted under section 1671c or 1673c of this title, or (C) a final affirmative determination resulting from an investigation continued pursuant to section 1671c(g) or 1673c(g) of this title.

While TKS is correct, and the parties do not dispute, that § 1675(b)(1) does not expressly provide for a changed circumstances review of the type conducted here, we think it is misleading to focus narrowly on the statutory definition of "changed

circumstances" to describe Commerce's conduct or interest in this proceeding.[5]  As its name suggests, § 1675(b)(1) is intended to facilitate the review of certain determinations when the circumstances have changed sufficiently from the time that the determination was originally made such that it may no longer be appropriate.  That is different from the situation at issue here—i.e., when the circumstances that led to the determination have "changed" only because the true circumstances, previously concealed by fraud, have come to light.  Thus, Commerce's focus was not on "changed circumstances" in the sense of § 1675(b)(1).  Instead, Commerce's reconsideration was just that—a reopening and reconsideration of its previously-conducted yearly administrative reviews based on newly revealed information of TKS's fraudulent conduct, which raised questions about the integrity of the original proceedings.

This Commerce had a right to do—apart from the statutory authority of § 1675(b)(1).  The prohibition against doing something <u>not</u> authorized by statute is altogether different from the power to reconsider something that <u>is</u> authorized by statute.  The power to reconsider is inherent in the power to decide.  <u>See</u> <u>Trujillo v. Gen. Elec. Co.</u>, 621 F.2d 1084, 1086 (10th Cir. 1980) ("[T]he power to decide in the first instance carries with it the power to reconsider.").  For this reason, the courts have uniformly concluded that administrative agencies possess inherent authority to reconsider their decisions, subject to certain limitations, regardless of whether they possess explicit statutory authority to do so.  <u>Macktal</u>, 286 F.3d at 825-26 ("[I]t is

---

[5] While Commerce could have (and perhaps should have) labeled these proceedings a reconsideration instead of a review of changed circumstances, we decline to exalt form over substance by delimiting the scope of Commerce's authority based on how it decided to label its proceedings.

generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions.") (collecting cases); Alberta Gas Chems., Ltd. v. Celanese Corp., 650 F.2d 9, 12 (2d Cir. 1981) (discussing "the inherent power of any administrative agency to protect the integrity of its own proceedings"); Bookman v. United States, 453 F.2d 1263, 1265 (Ct. Cl. 1972) ("[I]t is the general rule that '[e]very tribunal, judicial or administrative, has some power to correct its own errors or otherwise appropriately to modify its judgment, decree, or order.'" (citation omitted)).

An agency's power to reconsider is even more fundamental when, as here, it is exercised to protect the integrity of its own proceedings from fraud. Alberta Gas, 650 F.2d at 12; see also Elkem Metals, Inc. v. United States, 193 F. Supp. 2d 1314, 1321 (Ct. Int'l Trade 2002) ("A finding that the ITC has the authority to reconsider a final determination is particularly appropriate where after-discovered fraud is alleged."). As the Second Circuit observed in Alberta Gas, "It is hard to imagine a clearer case for exercising this inherent power [to reconsider] than when a fraud has been perpetrated on the tribunal in its initial proceeding." 650 F.2d at 13.[6]

---

[6] Over 60 years ago, the Supreme Court made the following policy statement that, albeit in a different context, reinforces our holding today:

> [T]ampering with the administration of justice . . . involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. . . . The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud.

Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246 (1944).

An agency's inherent authority to reconsider its decisions is not without limitation, however. An agency cannot, for example, exercise its inherent authority in a manner that is contrary to a statute. Macktal, 286 F.3d at 825; Bookman, 453 F.2d at 1265 (observing agency's authority to reconsider "absent contrary legislative intent or other affirmative evidence" indicating lack of such power). Thus, an agency obviously lacks power to reconsider where a statute forbids the exercise of such power. Similarly, in situations where a statute does expressly provide for reconsideration of decisions, the agency is obligated to follow the procedures for reconsideration set forth in the statute. See, e.g., Civil Aeronautics Bd., 367 U.S. at 329 ("[W]e are not deciding that the Board is barred from reconsidering its initial decision. All we hold is that, if the Board wishes to do so, it must proceed in the manner authorized by statute."). The agency must also give notice to the parties of its intent to reconsider, and such reconsideration must occur within a reasonable time. Macktal, 286 F.3d at 826 (citing Bookman, 453 F.2d at 1265). Finally, an agency may not reconsider in a manner that would be arbitrary, capricious, or an abuse of discretion. 5 U.S.C. § 706(2)(a); Macktal, 286 F.3d at 826. These limitations on the exercise of inherent power are uncontroversial and are not at issue in this case.

Here, no statute prohibited Commerce's review, nor were there procedures specified in any applicable statutory provision that Commerce failed to follow. While Commerce labeled its proceeding as a "changed circumstances review," its actions, as discussed supra, are not properly characterized as such. For this reason, the trial court was not required to decide whether Commerce's actions were consistent with § 1675(b)(1). Instead, the trial court correctly ruled that Commerce, under the

circumstances presented, acted within its inherent authority to protect the integrity of its proceedings from fraud. We agree with that ruling and hold that Commerce possesses inherent authority to protect the integrity of its yearly administrative review decisions, and to reconsider such decisions on proper notice and within a reasonable time after learning of information indicating that the decision may have been tainted by fraud.[7] In this case, Commerce acted within a reasonable time after learning of the fraud, gave the parties proper notice, and thus, acted lawfully under its inherent authority in reconsidering the 1997-1998 administrative review.[8]

## 2. Ripeness

The trial court concluded that Commerce's stated intention to reopen the sunset review proceeding was ripe for judicial review because, inter alia, it "qualifie[d] as a final determination by the agency." TKS, 473 F. Supp. 2d at 1359; see also id. ("[T]he agency formally made this determination after extensive research and analysis, and affirmed it in the Final Results."). Appellants argue that the issue is not ripe for review because a "stated intention to reopen" is just that, and does not constitute final agency action. TKS argues that the determination to reopen the sunset review proceeding is a final determination, and therefore is amenable to judicial review.

---

[7] We need not and thus do not reach in this case under what other circumstances Commerce, or another administrative agency, may lawfully reconsider a decision.

[8] TKS only challenges Commerce's authority to conduct the proceeding; it does not challenge the consequences that flowed from the final results of that proceeding—i.e., the application of the adverse facts available rate or the reinstatement of the antidumping duty order from September 1, 2000 through September 3, 2001.

The essential purpose of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967). In determining whether an appeal from an administrative determination is ripe for judicial review, we look to (1) "the fitness of the issue for judicial decision" and (2) "the hardship to the parties of withholding court consideration." Id. at 149.

With respect to "the fitness of the issue for judicial decision," it is clear that non-final agency action is not ripe for review. See U.S. Ass'n of Imps. of Textiles & Apparel v. U.S. Dep't of Commerce, 413 F.3d 1344, 1349-50 (Fed. Cir. 2005) ("USA-ITA"); see also 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."). Thus, the threshold determination in any ripeness inquiry is whether the challenged agency action is final. "As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" Bennet v. Spear, 520 U.S. 152, 177-78 (1997) (citations omitted).

TKS argues that the agency's stated intention to reopen the sunset review is a final agency determination because it was contained in the "Final Results of Changed Circumstances Review," which is itself a final agency action reviewable pursuant to statute. In the "Final Results of Changed Circumstances Review," Commerce set forth the results of its changed circumstances review with respect to the effect of TKS's fraud on the yearly administrative reviews and consequent revocation of the antidumping duty order. In the concluding paragraph, however, entitled "Final Results," Commerce stated that "upon the completion of this review, we will reopen for reconsideration the sunset review that resulted in revocation of this order. . . . This notice serves as advance notification that we will reopen a sunset review approximately 30 days after publication of these final results." 71 Fed. Reg. at 11,591-92. This statement of intent, according to TKS, is a "final determination [by Commerce] . . . that it has authority to reconsider the sunset review and that the facts warranted reconsideration." TKS's contention is misplaced. The fact that Commerce's stated intention to reopen the sunset review was contained in a section entitled "Final Results" does not make it final agency action. A memorialized intention to reopen the sunset review neither "mark[s] the consummation . . . of the decisionmaking process" nor defines rights or obligations with respect to TKS or causes legal consequences to flow. Bennett, 520 U.S. 177-78.

The only thing that is final, and thus the only thing subject to judicial scrutiny, in the "Final Results of Changed Circumstances Review" was the result of the changed circumstances review. While TKS argues that the decision to reopen the sunset review was final, that is insufficient, by itself, to constitute final agency action. In FTC v. Standard Oil Co., the Supreme Court determined that the FTC's issuance of a

complaint, which alleged reason to believe a violation of the Federal Trade Commission Act had occurred, was not final agency action because it "[wa]s not a definitive statement of position. It represent[ed] a threshold determination that further inquiry is warranted and that a complaint should initiate proceedings." 449 U.S. 232, 241 (1980); see also id. at 241-42 ("[T]he averment of reason to believe is a prerequisite to a definitive agency position on the question whether Socal violated the Act, but itself is a determination only that adjudicatory proceedings will commence."); USA-ITA 413 F.3d at 1349 (action not final when agency agreed to accept petitions, but had not ruled on them). A stated intention to reopen is just that, and leaves room for Commerce to change course. Although Commerce stated that it intended to reopen the sunset proceedings, it could, for any number of reasons, elect not to do so. This is precisely the reason why courts decline to address issues that are not "ripe": "to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs., 387 U.S. at 148-49.

With regard to the second Abbott Labs. factor, there is no undue "hardship to the parties of withholding court consideration" in this case. TKS claims that it will face "unwarranted and unnecessary burdens if it cannot obtain judicial review at this time." It argues that because Commerce has no authority to reopen the sunset review, it will be forced to undergo a futile exercise that will expose it to unnecessary expense, burden, and commercial uncertainty. Whether or not Commerce has legal authority to reopen the sunset review, at this juncture TKS faces no "legal or practical effect, except . . . the burden of responding to the charges made against it." Standard Oil, 449 U.S. at 242.

Moreover, as we held in <u>USA-ITA</u>, "any business uncertainty associated with awaiting a final decision from an agency is . . . insufficient to turn a threshold agency decision into a final agency action ripe for review." 413 F.3d at 1350.

Because Commerce's stated intention to reopen the sunset review proceedings is not final, and thus not fit for judicial decision, and because withholding court consideration of the issue presents no undue hardship to the parties, we conclude that it is not ripe for judicial review.

III.  CONCLUSION

For the foregoing reasons, we conclude that the Court of International Trade correctly determined that Commerce possessed inherent authority to reconsider its administrative review. However, we conclude that the Court of International Trade erred in determining that Commerce's stated intention to reopen the sunset review proceedings was ripe for judicial review. Accordingly, the decision of the Court of International Trade is

<u>AFFIRMED-IN-PART</u> and <u>REVERSED-IN-PART</u>.

COSTS

No costs.